May it please the court, Mr. Miskell. My name is Frank Leone. I'm representing David Alejo Martinez-Rijalva. He is one of three defendants that were convicted after jury trial of conspiracy to possess over a hundred kilos of cocaine and of actual possession of one kilo of cocaine. The facts in this case show that, through an informant, DEA agent Morinelli was able to persuade Martinez-Rijalva, Bermudez-Chavez, who is represented by Andrea Matheson, and Mr. Grajeda Encinas, who is represented by Mr. Willeman, Mark Willeman, to sell Mr. Morinelli a hundred kilos of cocaine. Mr. Morinelli was acting in an undercover capacity. His role was to act as a big-time dope dealer from the East Coast. And he had come out to Tucson, Arizona, and was attempting to persuade them to sell to him a hundred kilos of cocaine. The evidence certainly suggests that at least Mr. Martinez-Rijalva was predisposed to sell cocaine. On a number of occasions, there were meetings over a period of about three months, on a number of occasions when discussions were had, Mr. Rijalva, Martinez-Rijalva offered to sell anywhere from 10 to 20 kilos at a time. In some instances, he offered slightly lesser quantities. The problem was that Mr. Morinelli, before he started out, he and the informant decided that they were going to try to make a deal for a hundred kilos. And repeatedly, on at least four or five occasions, any time that the defendant, Martinez-Rijalva, who was the primary negotiator, if you will, offered that amount, Morinelli would simply say, no, I'm not interested in that. I don't want to even look at it. Let's agree that sentencing entrapment is probably your best argument. Yes. Does the C case have any impact on that? Pardon me? Does the C case have any impact on your ability to raise that because of waiver? I don't believe so. And I think the reason is this. The entrapment case certainly permits the judge to exercise discretion to depart from the guidelines, and so does the sentencing guidelines. In fact, note 12 specifically addresses that point. So regardless of whether or not the defendant makes that objection, and I'll tell the Court that in sentencing, we did make the argument conceding that the guideline calculation was correct. Because I think once the jury makes the judgment... But he didn't invoke the guideline provision, did he? No, he did not invoke that specific guideline provision. The argument was made in general terms, right? Correct. But without note to note 12 and some details. Without reference to note 12, correct. So in other words, you had you were making the argument without reference to the specific law. And then as I understand it, the trial court felt he would be overriding the jury verdict to sentence different than for the full-up. I will tell the Court that one of the co-defendants made the argument that the note allowed the Court to depart downward where there was less than the amount that agreed upon was actually delivered, as it was in this case. After all this negotiation, there was only 2 kilos, and I think there was conviction for only 1 kilo of cocaine. Let me ask you about that. It seemed through all the discussions, when they kept asking for about 100, they're saying, no, we can only get 5 or 10 or whatever. But there was one occasion when the defendants, and I can't specify which one might have said this, but they did offer 127 kilos. Do you recall that testimony? I do recall that testimony. The question I have is, in the face of all the other testimony, you do have this one piece of evidence about the 127 kilos. What does that do to your argument, if anything? Well, I think undoubtedly there was an agreement to sell a quantity of cocaine. And as the jury found because of the special interrogatory, it was 100 kilos. And I'm not disputing that the guideline calculation was an appropriate one. Now, the issue we present is whether or not the judge was wrong in concluding that he can't simply say, look, even though that's what the jury found, the facts are that there's only 2 kilos and 60 kilos of fake cocaine. Does that – is that enough for me to consider departing downward based on the fact that, one, there was sentencing entrapment, or, two, no 12 says that I can. What's the remedy here, if you're correct? I think it's remand and for the court to consider whether it can depart downward from the guideline calculation. Because Judge Burry decided if the jury tells me, based on their verdict, that it's 100 kilos, I can't depart downward. And maybe I should have – Isn't that in fact the case, though, in at least the conspiracy count? I understand your point with respect to the other count, but with respect to the conspiracy, it really doesn't matter whether they were able to deliver, does it? I think it does. Why? I think it does because that's exactly what no 12 talks about. When there is an agreement to – Wait, wait, wait, wait, wait. We're talking about conspiracy. You don't have to produce anything. They have to have an agreement that they're going to deliver 100 kilos. And if they do that, why is there an issue of whether they can deliver it? Now, there may be in terms of the charge that they delivered it. That's different, where they delivered the plaster instead of the real stuff. But in terms of the conspiracy, what relevance does that have? Well, the guidelines are – and in fact, no 12 talks about this. When there is an agreement to produce a specific quantity and that quantity specifically is not produced, the court may in some instances consider whether or not they had the capability or the ability or even the intent to do that. Do you have a case that says that is so in a conspiracy count? I understand your point about the other one, but in a conspiracy count, what's your case authority for that? I believe the Stouffer case that is cited in the briefs addresses that. In that case, there was a defendant who was asked to produce, I think it was 5 or 7,000 doses of LSD. And when he met with the informant and the undercover agent, an ATF agent, they continued to insist that he should produce 10,000 because it was going to be more money for him. And in fact, that was the agreement. And I believe when he showed up to deliver that is when he was arrested. But I don't think he ever produced that quantity of LSD. And in that case, this Court – and that was a conspiracy count? I believe so, Your Honor. Did you offer any evidence that they could not produce 100? I think throughout cross-examination, that was the effort. But I think the most compelling evidence is the fact that there's 60 bricks of fake cocaine. No, but did you offer any evidence that they could not produce 100? At the sentencing, the defendant – At any point in the trial or sentencing? No, not at the trial. What? Not at the trial. And at sentencing, did you produce any evidence? At the sentencing, my client, Mr. Martinez Grijalva, had written a letter to the judge where he said that he had contrived to produce – that he couldn't produce 100 kilos and that he – Was that evidence? A letter to the judge? It was presented to the judge. We – there was a discussion about it because we had mailed a letter – It's just a statement. That wasn't evidence. Well, I think it's something that the judge could have considered. But you didn't produce any evidence? Correct. At this point. There's no evidence that they couldn't produce. But, again, the burden is not on the defendant to produce it. It's on the prosecution to prove that they, in fact, could and would produce 100 kilos. The fact of the matter is that, after all the evidence, they produced two. Well, I don't know. The conspiracy is that they agreed to produce 100. Part of your defense is they couldn't have meant it. But you don't show why they didn't mean it. Well, I think, Your Honor, when you have this type of case – And I'm not saying that the jury wasn't justified in its verdict, that the conspiracy was for 100 kilos. But in the sentencing context, the judge can certainly consider whether they had that capability. Well, your argument is that, as I understand it, the judge misapprehended his authority. Correct. So he's never actually made the decision that we're talking about here. That's correct. Because he felt he was bound by the jury rule. Mr. Chavez, did you want to turn this over to your colleagues who look a little anxious there? I will concede the rest of my time to them. Thank you. Good morning. May it please the Court, my name is Andrea Matheson, and I represent Appellant Bermudez-Chavez. I intend to speak for approximately eight minutes. Eight minutes? Eight minutes. Oh, what a tangled web we weave when first we practice to deceive. I've heard that before. I stole it from Sir Walter Scott. The reason why I bring this very famous quote up is because three of my five arguments that I make in my briefing really has the common thread with regard to the deception of the confidential informant, Ricardo Andrade. I'm going to jump to the second argument, which is the agreement regarding the disclosure of the confidential informant's immigration file. And as you all know, the Brady violation occurs when we look at the three factors. We see that the evidence must be favorable to the accused because it's exculpatory or impeachment evidence that is suppressed by the government and that is material or prejudicial. And I think that a very informative case in this argument is the Bernal Obeso case, where the Ninth Circuit remanded to the district court to determine whether there was a confrontational clause violation. And in that case, it talks about the fact that the confidential informant in that case actually lied to the DEA agents. In this case, we have conclusive testimony by the confidential informant that he actually lied to the prosecutor and DEA agent. At the pretrial motions hearing, where I went through a list of 20 items that I was requesting under Brady and Giglio, I asked the government, asked the confidential informant regarding his drug use. Confidential informant said, I have not used drugs in the last five years. On cross-examination, it was clear he admitted that he had last used during this investigation. And the facts in the cross-examination throughout the trial testimony just shows that Mr. Andrade was a liar with a prior as well as a very troubled man in terms of his drug use. He used cocaine. I'm a little concerned about it. You're alleging a Brady violation. In order for you to be successful with that, you have to show that that information, the confidential information that you sought, would have affected the result of the trial. And yet, on the other side, you're saying, we proved this guy was a liar. You know, he did this and he did that and the other. You got what you wanted. I did.  So, where in lies the bad trial as a result of a Brady violation? Good question, Your Honor. Thank you. And that's the very issue that's addressed in Bernal Obeso. It was the tip of the iceberg. So I was able to show on cross-examination that he was a liar with regard to his drug use. But there were many other factors that the defense simply was not able to impeach Mr. Andrade about. Do you know what was in the file? No, because I was not given the opportunity, nor did the court ask for an in camera. Well, on a Brady violation, don't you have to show what was not given to you and why that would have been prejudicial to your trial? You haven't shown that, have you? Well. The fishing expedition. It isn't a fishing expedition if we, as the defense, show initially that we have proven that there's some evidence that there's an inference that the government failed to disclose favorable material. Well, you asked for it. But that's the first part of the Brady violation. The second part is the prejudice. So without prejudice, a lot of times we even assume a Brady violation, but then we say, is there prejudice? Well, what we can look at in the facts of this case are just very important. We already went over the drugs. The informant admitted to using different names. There was a question. Basically, you know, he was not Sister Andrade when he came to be a confidential informant, and everybody knew that. So I'm not sure how these sort of around the margins to make him like a little worse or a little more bad, if you will. How would that change the calculus of the trial? In the closing argument, the government attorney said, we don't need Andrade. Without Andrade, we can have a conviction. And I submit, Your Honor, that is absolutely false. The government needed Andrade. Andrade was the key witness for the government. And that brings me to my next argument, which was that the confidential informant was the interpreter between the undercover agent. Well, Your Honor, I beg to differ that he was a conduit. Because in a conduit, it talks about, well, a conduit would be a nice tunnel that just flows freely with the interpretation. In this case, and we see the case law, we have to look at whether the interpreter had any motive to mislead or distort. So you're switching from Brady to the language conduit now, right? Yes, but they do overlap. They do overlap. The government was provided by the informant. That's one of the factors that we have to look at under the Nazemian case. The motive to mislead or distort in this case we saw was money, money, money, money. This man was a confidential informant, although he claimed he was a confidential informant because he also wanted to get the drugs off the street, the ones that he was He had a history of drug addiction. He used alias names, dates of birth. There was money judgments against him, fraud allegations, financial problems. And he admitted on cross-examination, the bigger the deal, the bigger reward he would get. In this case, he got $19,000. So he got that all out in the trial. Everybody knew about it. But the problem is, is what it took. How much was it? He got $19,000 for this trial, for this case, $19,000. If that had all been sequestered, if none of this came out and he appeared like Mother Teresa, you might have a case here. But on this point, I'm having difficulty finding the prejudice. Because if all the horrible things that this guy was and did were described in the trial, where's the prejudice? The problem is, is everything really rested upon the credibility of this witness. It was the government star witness. And this was the witness that was interpreting for all of the defendants in this case. But, Sandy, you hammered that, didn't you? You really nailed that. Great job. I don't think I nailed it so well when they came back guilty on both counts with 100 kilograms. But the jury evaluated it. You know, the thing is, there is like, he's not going to get the money if it doesn't work out. And there's this, he has a vested interest. So the vested interest cuts both ways, right? Yes. But he was also playing both sides because he was getting drugs and money from the defendants as well as getting money and protection from the government. And in this case, the jury only got to hear the interpretation of a very biased informant instead of a neutral party that would be able to communicate the actual intent and specifically agreement of the defendants to the government. Did you object to his being the interpreter? Oh, yes, we did, Your Honor. That was pretrial, and it was not granted our motion. Thank you. I'll defer to the rest of mine. Thank you. Good morning, Your Honor. Good morning, Mr. Mesco. If it pleases the Court, my name is Mark Willam, and I represent Mr. Ablardo, Grajetas, and Sinas. And I'm in an uncomfortable position of disagreeing with counsel. If we were to write a hypothetical and we use the facts in a hypothetical and we ask students such as these to answer the question, it would behoove any professor to find that the crime committed here is possession with intent to distribute cocaine. And the elephant in the room is the 60 kilos of building material. Once that shows up, we know that everything that happened up to that point was a ruse. It is no different than any other fraud scheme, whether it be diamond, gold, bonds. I show you something real. You see it's real. You check it out. And then somewhere along the way, the facts change. These men, while they did commit a conspiracy, Judge Noonan, it was not for possession with intent to distribute cocaine because there was no cocaine. Well, there was some. You're talking about the sentencing entrapment issue. No, I'm not. I'm talking about the offense committed. If you ask someone about this fact, the facts here do not support conspiracy with intent to distribute cocaine. Wait a minute. Wait a minute. Help me with this. My understanding is that there was a certain amount of cocaine that was given. And there was a certain amount of plaster, too. But the necessity to have cocaine there, you're not saying the whole thing was plaster, are you? No, but you need the real – let me ask you. Try to do a fraud scheme without real cocaine. I ask you to do any – But there was some cocaine. There has to be. But there has to be any fraud scheme, any fraud scheme you have, be it gold, diamonds. You have to have something real. Let me step back to kind of build this from the bottom up. Do you concede that there was a conspiracy for something? Yes. Okay. What, in your view, was the something? The fraud, whoever the buyers were, of $1.5 million. And in order to do that, you have to have – You have to have – they offered up some cocaine, correct? You have to. It has to be. It's a necessary element. You cannot – And they were convicted of – your client was convicted of – Yeah, my client was convicted of possession with intent to distribute 100 kilos of cocaine when they spent the time and effort to go to Home Depot to steal the materials. These guys didn't have the money even to buy the materials. They go to Home Depot to steal the plastic and the wrap to make these things look like cocaine. We know what their intent is because at the end of the day, there is no cocaine. Wait a minute. You're saying that again. Show me in the record – tell me in the record where it says there was no cocaine. The record that I looked at said – I forget the exact quantity – like five or ten kilos of cocaine. No, sir. But the rest was plaster. Am I wrong about that? There was one – One kilo on March 26th. There was one kilo on March 26th. And then there was one kilo on April 21st. There was one kilo each. And the reason there's one kilo each is the one kilo in the March date was the kilo to say, hey, we got good cocaine here. Then on April 21st, they've got a whole truckload of 60 kilos of cocaine. And what are they saying? Hey, I've got another kilo of cocaine here. And the other stuff is just like it. It's a magic trick. It's required. This is the element. So what happens now is we've got individuals that sat on $1.5 million worth of dollars in a fancy private jet. And these guys get together and say, listen, we can rip off this roof from New York. I don't think it's the brightest thing in the world to do coming from New York, but I'm telling you. At this point, I think if these were real mafiosos – You've never done anything like that, have you? Honestly, Your Honors, if this was a mafiosos from New York, I don't think they'd have a chance. They're lucky they were dealing with the government. But quite frankly, this is not a conspiracy to distribute cocaine because we've got 60 kilos of building material. Is it a conspiracy to distribute some cocaine but not 100? No. Cocaine is merely a tool of the conspiracy. That's a novel argument. It's not a novel argument. This is what we do all the time. I asked the court to ask this question. That's a negative, not a novel argument. You do that in New York, right? Yeah, yeah. Well, I mean, as someone who's a salesman myself, one of the things I've always done is you try to defend what you do by providing the goods you present. Those guys on television that offer those things for $19.95, they have to present something that at least does something that they say it does. If they don't, it's a fraud scheme. Counsel, how do you deal with the case of U.S. v. Sharif? I didn't argue that, Your Honor. No, I'm asking you now, not what you argued. How do you deal with that case? I don't. Do you know what the case is? I have no idea. Okay, let me tell you what the case is. Okay. Honest admission. In Sharif, we held that a conspiracy conviction was upheld because the party merely discussed the sale of heroin. The sale was never even consummated. But we convicted them. We held it, upheld it. Now, in this case, as is indicated, there was some cocaine. I know this case now, yes. Okay. There was some cocaine. You're saying that there wasn't enough cocaine? No, that's the whole point. The cocaine was merely a tool for the conspiracy to defraud the government of $1.5 million. It's a necessary component. You can't have a fraud without the two kilos of cocaine. It's impossible. But you had two kilos of cocaine. But the only reason we have two kilos is because it perpetrates the rest of the conspiracy to defraud. Counsel, you ought to go teach at the School of Theology. I'm sorry? You ought to go teach at the School of Theology. This is metaphysics. If you understand, if we're taking this to really – your argument would be that there – and, of course, we're looking here. Your argument is the sufficiency of the evidence argument as to the conspiracy claim, correct? No. I'm arguing – I'm arguing that the crime committed here is not conspiracy with intent to distribute cocaine. It's conspiracy to defraud the government of $1.5 million. Well, let me step back. That may be your argument, but we have to fit it in the context of what went to trial. So if it's not a sufficiency of the evidence argument, then what's your hook to overturn that count of the conviction? What we have here – What is it? If you look from a juror's perspective and you saw the evidence that was presented to them – First, answer my question. What is the claim you're making that you want this Court to look at to overturn this conviction on that count? Okay. The fundamental principle – you're absolutely right, Judge – it is that there is no – there's not sufficient evidence to show that – And that's what we call a – That the defendants ever intended to distribute – That would have been an easy answer, and then we could figure out whether it meets Jackson v. Virginia. Do you want to preserve the remaining five minutes for time amongst you? I'll just go forward, Judge. The bottom line is that I think the Court's pretty well versed about my conspiracy. It's not conspiracy to possess. The other issues that I had before others really quickly, 2D1.1, Mr. Leon spoke about it briefly. I asked the Court to review that application, note 12, and I did argue it – You're talking about a variance, a reduction? It's actually – it's a departure. It's a standard departure. And I did – I'm the one who briefed the Court, and if you look at ER1 on my excerpts of record, you'll see that Judge Burry did it. Mr. Musgill, I think, missed page 1 on my excerpt of record. He said that I didn't, but I did, and the judge ruled on it. I think that's pretty clear. There were two kilos of cocaine. Even if you want to find out my clients wanted to do that, then sentence him according to that. However, I got to ask the Court to really consider the pre-sentence report as far as minor role, 3B1.1. One of the things that the Court had the evidence of are three separate pre-sentence reports. Pre-sentence report one says person A is a leader. Pre-sentence point two says person B is a leader. Pre-sentence point three says he's just an average participant. Under 3B1.1, he should be given a reduction given that these three convicted persons are not on the same level. Two are considered leaders. One is considered average. My client should have gotten a reduction. And the last one as far as safety valve is concerned. But in each of those cases, though, the government cited what was allegedly said. One said he was the boss. There was the knowing wink, et cetera, et cetera, all that sort of thing. Doesn't that qualify in some way? Your Honor, it would, except what happens is that the government has the opportunity to object to those pre-sentence reports. And the Court is well aware that there's a sufficient stare decisis that says if you keep your mouth shut, then you will adopt what the pre-sentence report writer says as far as the characterization of the players. The last one I want to bring up quickly just so I can run my time out, Judge, is the safety valve. We get a lot of cases, especially in the Tucson District Court, and quite frankly, I guess I come here with a hat in hand and ask the Court to consider that when I read what was required for safety valve, I was under the impression, and so was the government prosecutor and so was the district court judge, that some sort of admission was required. A person who maintains their innocence throughout. And that's not true. And quite frankly, I found out after the fact, almost to grin, that that's not true. There is sufficient case law. It is old, and somehow I didn't dig it up, and I apologize to the Court and to counsel, that in safety valve, basically, if an individual tells everything he knows, then that's it. And there's nothing in the record at trial that really contradicts what Mr. Grajeda's role is here. I would ask the Court to parse out the actions of each defendant, because I think that's required. And if the Court were to cull through the records, as I have, I stand behind my record, and the government seems to agree with me by lack of any point to the record, that my client's role in this was merely a chauffeur. He was a driver who happened to be borrowing a vehicle that happened to be owned by one of the primaries in this case. But even then, the primary role. I will ask the government, of course, but sort of the government and you both kind of confessing error and saying you want to remand that to the district court, what can we do when we have a record where the counsel said, yeah, that's right, we don't, you know, he didn't completely, you know. I think under the plain error doctrine, Your Honor, I think what you need to do is to say, look, yeah, there's error. Yeah, it's plain. But really at the end of the day, does it really change anything? I think that's what you need to do. It's the common sense. I think Judge Noonan is well known for his application of common sense. And I think in this particular situation, I think common sense dictates whether or not it's going to change anything if you view that the error was so egregious. Well, I would certainly agree that our colleague has a lot of common sense. He does. And is a very handsome fellow. He does. That as well, sir. But I actually wrote a dissent arguing your point, and I lost. I'm sorry to hear that, Judge. Thanks. Well, you've been very cordial. I'd like to thank the Bull Tall for inviting us here. Thank you very much. Thank you. We'll hear from the government. Why don't you start where we ended, and that is it seemed like everybody in the trial court was under a misapprehension as to the safety valve rules. What's the remedy for that at this stage? Well, the government's been excuse me. May it please the Court. I'm Bob Niskell with the United States from the U.S. Attorney's Office in Tucson. Welcome. Thank you. On the safety valve for Mr. Grajeda, of course, it is plain error review. And the government would submit the defendant does not meet that standard in this case. Well, you don't agree with his position that there was error, right? No, I don't. I kind of understood him to say that you were acquiescing in that, but you're not. You're not, right? No. The government agrees that theoretically a defendant who maintains his innocence could qualify for safety valve. The government's position. Did you take that position in the trial court? No. No. That's what I said. Everybody was off on the wrong law. Even if you assume that as being theoretically possible in this case, it did not happen in this case. The defendant simply did not meet the tell-all-you-can-tell provision of the safety valve. And that's the government's position. So the district court, under plain error standard, did not err by not granting the defendant safety valve. When you say he didn't tell all he could tell, is that for us to evaluate? What's that? He didn't tell all he could tell. If the district court didn't think it had the authority, then that's a legal error. And I'm not sure how on appeal we would be trying to sort through the facts and evaluate whether he told all he should have told. As I point out in the brief, there is no record that the defendant mentioned anything to the prosecutor. And this Court has held talking to the probation officer is not talking to the government. Didn't he ask to talk to the government? I believe he may have, but, again, there's no indication. No indication. I thought he asked to talk to the government and they wouldn't let him. They didn't, like, entertain his entreaty. Even so, the defendant's record. Well, why don't you tell me whether that's true? I do not recall from the record, Judge. Pardon me? I do not recall from the record whether that's true or not. It may be. But even if it's. You don't dispute what they put in their brief? No. Even if that's so, the defendant – the only statement made that we have of this defendant is what was told to the probation officer. Even taking that as a statement to the government, it is so inconsistent with the evidence at trial. It does not address many of the actions that there is no dispute the defendant was involved in that it cannot qualify as being telling all you know. And then there is clearly, is there not, a consistent or a case law that indicates that if someone's seeking safety valve treatment, even if they talk to the government and they lie, that there's no benefit, right? That is correct. They have to tell all they know. So from your perspective, even assuming the probation officer was a duly authorized person to whom he could talk, what he said allegedly and what showed up later was totally inconsistent and therefore there's no safety valve protection. That is correct. Okay. Now, on the issue that kind of all three defendants touched on – excuse me, let me get my notes here – is the weight of the cocaine. As the government sees it, there are actually three separate issues in this scenario. The first one is the sufficiency of the evidence of the conspiracy to possess with intent to distribute 100 kilograms. The second is the application note 12 of the drug guidelines. And the third is the sentencing entrapment. And I'll discuss each of those in sequence. First of all, as far as the evidence to support the jury's finding that there was a conspiracy to possess with intent to distribute 100 kilograms of cocaine, obviously since it's a sufficiency of the evidence argument, it's the evidence that's viewed in the light of the jury's findings.  And the third issue is that there was a consistent talk throughout the course of the negotiations about the defendants providing 100 kilograms of cocaine. And that is the most favorable to the government to determine if any rational prior effect could reach the conclusion. Is it Jackson's standard? That is correct, Judge. That was the point I was trying to make with your colleague from New York over there, was that the reality is that when you have a conspiracy, and maybe from the earlier counsel, at least as I understand the case law, in the conspiracy, it's the agreement to do something, whether you even get about it, just you've talked about it. Is that correct? That is correct. Under the law, the conspiracy is the agreement in a drug conspiracy that the government doesn't even have to show an overt act, although, of course, we do have that in this case. But it's the agreement that's the crime, and there was sufficient evidence for the jury to conclude that there was an agreement. Right. Okay? So in that setting, as to that part of the case, it doesn't matter whether there were one, two, three, or no kilos, right? That is correct. This conviction could have been upheld on this record even if no drugs were produced. Well, is the relevant conspiracy really between and among the defendants, or is it with Agent Morinelli? Well, Agent Morinelli is the government agent and can't be a conspirator. Pardon? The government agents cannot be conspirators. Right. But every time this is talked about in the briefs, it's as if he is a conspirator. It's like the agreement with, the agreement with him to sell this, and that's why I want to say that was what was disturbing to me in the briefs, because the agreement has got to be, the conspiracy has to be among the defendants. That is correct. And there is enough evidence in the record to show that the defendants were agreeing to it. So what evidence do you point to that defendants were actually agreeing to the 100 kilos? Okay. We've got the initial discussions with the informant Andrade. All three of the defendants are present. They told, all three told in the discussion where all three were present, they, Andrade said the undercover agent was interested in buying 50 to 100 kilograms and did not want to do one, two or 10 kilogram deals. The defendants said that they could produce that quantity. Again, they're all together as a group there. They're saying they can produce that quantity. Then they have the first meeting with Agent Morinelli and Andrade, and again it's Bermudez-Chavez and Martinez-Grijalva are also present. They talk about how they had recently sold 600 kilograms of cocaine, and both of them told Agent Morinelli that they could produce 100 kilos or more. Then you have the second meeting with Agent Morinelli, where they, where the, they, again, there was a discussion that the cost would be 23,000 a kilo. Then you have the sample where one kilo was produced, and again all three defendants were involved in some way in that transaction. Then you have the incident on the airplane where the government flashed the 1.5 million. Again, there was a discussion about producing 100 kilos at that time. And at that time, it was Martinez-Grijalva and Grajeda and Sinas that were present. Bermudez wasn't present at that one. Then there's a discussion between defendants Bermudez, Martinez, and Morinelli, the undercover agent, about doing two 50-kilogram transactions, breaking it up into two 50-kilogram transactions. And then the final one where the cocaine is seized, I think the important point to remember is at that point, the defendants did not know the government was going to seize the, whatever they had that day. Because Agent Morinelli had told them, I don't have the money. I'm not going to get the money until I see the cocaine. So that was kind of the equivalent, the defendants' equivalent of the government flashing the money. The defendants flashed the cocaine, or what they alleged was cocaine, and ultimately it didn't work out that way. But how do you respond to the argument, which I guess I would characterize the defense argument as bait and switch? Well, we never really intended to have real cocaine. We just had some fake cocaine. We thought we would dupe this guy. What is the government's response to that argument? The government's response is that the defendants all made that argument at trial, and the jury rejected it. And on this record, there's sufficient evidence to support, again, the evidence in the light most favorable to the government, that the jury's decision was rational. So we're back to the Jackson standard. Back to the Jackson standard. Right. Exactly. So the Arizona jury didn't buy the New York scam, is what you're saying. That is correct. So then the next issue on the weight of the drugs is the Application Note 12 to the Drug Sancing Guideline. And in that one, basically, Note 12 says, and this Court's case law interpreting Note 12 says that the negotiated amount is the baseline. In this case, the negotiated amount was 100 kilograms. Then the defendant has the burden of showing less. And the government's position is they didn't meet the burden in this case of showing less, because all they did, they didn't introduce any evidence at sentencing. All they did was repeat the arguments they made to the jury. And the district judge said at one point, how am I supposed to do that when the jury clearly rejected that argument by a beyond a reasonable doubt standard? And then at another point, am I just supposed to accept that story that the jury didn't? So as far as the Application Note 12 argument, the government's position is basically it's a failure of proof on the defendant's part. It is unclear to me whether the district court really understood his authority in terms of the baseline, of course, would be the 100 kilos. And then under Note 12, you would make an analysis of whether, in fact, you should be sentencing below that. As I read that, I read the district court not as saying you didn't meet your proof, but, of course, because they had no burden of proof at trial. That was the government's burden. But I read it as the district court saying, well, the jury convicted you of this, therefore, my hands are tied. Why isn't that, in effect, what happened here? And he didn't say I'm going to start at 100, I'm going to look to see whether I should go below it. I have the authority to go below it, but I won't. He didn't really follow the normal thought pattern. At the end of the sentencing call, when he's explaining his sentence, the judge very definitely states, I know I have the authority to depart and I'm not going to do it. I know I have the authority to vary and I'm not going to do it. So he knew he could go downward. So from your perspective, U.S. v. Nanang Ho doesn't really change the result there. No. I really do think this is a simple one. The judge's comment, am I just supposed to accept the story that the jury didn't? And in the situation where no additional evidence was produced to him, that it is just a failure of proof on the defendant's part. It is an interesting proof question because obviously note 12 clearly indicates that in sentencing what the defendants were not capable of producing is supposed to be reduced. On the other hand, how is that proven? I gather here the judge said, you know, they made the story to the jury, the jury didn't buy it. I don't buy it either. And I kind of look to the jury to buttress that, so I'm sticking with that. Is that what it is? And that's the government's reading of the record at the same time. But, you know, if that's your argument, you might as well throw note 12 out the window, because every time you're in one of these situations, you start with the amount the jury convicted you of or the judge, if it was a non-jury trial. So you always start with that. And you say, well, that was the proof at trial, and we certainly would sustain that under Jackson v. Virginia. But doesn't that, isn't it then incumbent to say, now I have to see, though, if there is a reason to believe, not beyond a reasonable doubt, not beyond a reasonable doubt, but a reason to believe that I ought to go under. So if we accept your argument, face value, I would not see how note 12 would ever have any traction. I think the way note 12 would have traction, Judge, is in a case where, okay, you've got the jury verdict. At Sensing, the defendants would produce some type of additional evidence to enlighten the Court to demonstrate that they actually couldn't produce it or were incapable of producing it. Of course, to do that, they would have to probably testify and subject themselves to cross-examination, which they clearly didn't do in this case. I agree with Judge Noonan. Submitting a letter to the Court isn't evidence. They presented no evidence. I think in a note 12 situation, it almost calls to the defendants to produce more than simply repeat the argument they made to the jury. But what about the cases that say, and as referenced by Judge Smith, that if you really weren't producing the actual thing, which they didn't here, I mean, they – there's no evidence that they went out and were flummoxed in their effort to get 100 kilos. They didn't have it. They kept – you know, the whole conversation is, look, I can't get that kind of drug, you know, 5, 10, yes, but I can't get 100. That's what they kept saying. And that's – you know, that testimony is in there, and then they come up with these, you know, stolen things from the hardware store. How else would they – would they meet some burden? I would suggest that, first of all, there were repeated assurances that they could get the 100 kilograms throughout the course of negotiations. And, again, I go back to, they didn't anticipate that the government was going to get their hands on the fake cocaine on that day at the restaurant. So, again, the record, it's incumbent upon the defendants to meet their burden that they couldn't produce it, and they didn't intend to produce it, and that's simply lacking. And I like that. But, you know, I guess here's one question I have. If I go back and I look at the record, it's the agent that keeps introducing the 100 plus into the dialogue. And they're talking every time about these smaller amounts. He's going, no, no, I want this. He's insisting on that. Isn't that precisely what Note 12 is designed to address? I think that more goes over into the third issue, which is the sentencing entrapment, actually. Right. So let me address that one next. Excuse me. Again, sentencing entrapment is an issue where the defendants have the burden of establishing by a preponderance of the evidence that they lack the intent to produce the quantity of the drug, and they lack the capability to produce the drug. That's the Naranjo standard, right? Right. And, yes. And this Court has held that in making that determination, the Court, the district  to produce the 100. It is, of course, to consider the amount of inducement from the government, the level of reluctance by the defendants. You would agree that the amount of inducement here was significant? No. No, I don't think I would agree with that. Roll out $1.5 million and say I want 100 kilos and he keeps saying it. What the government was saying right from the beginning, when that first discussion with Andrade, don't even start this if you can't produce 100. I mean, the government made clear what it wanted right up front and the defendants very willingly said, yeah, we can produce 100. We're willing to go forward. So in that sense, I'm not sure. This is not a situation where the government did kind of a bait and switch where the government said, oh, we want to buy five. And then once we get the negotiations going, we say, oh, let's make it 50. Let's make it 100. That's not the situation. This situation was from the beginning, we want 100 kilos. And we don't want to do small deals. I'm still confused, though, counsel, as to how — who's making this determination? Under and around whom? Is it the district judge, independent of the jury and free of the Jackson standard, who weighs a showing by the defendants of their lack of intent and their inability to produce the drugs, or is the judge entitled on a Jackson or some other standing to be affected by what the jury found in determining whether the defendants who clearly have the burden of proof under Naranjo met that burden? I think, as I read it, it's up to the judge to decide. Now, certainly, he can look to what the jury found as a starting point. Sure. But — Okay. If that's the case, then, so if we agree with what the defendants are saying and we find sentence entrapment, then this would go back to the district judge for resentencing. And at that point, they would have the burden to show that they didn't have the intent and they didn't have the capability to produce the drugs. Is that correct? That's correct, if you found sentencing entrapment. I understand. I'm sorry. Arguendo, as they say here at the law school. Okay. And that district judge, though, would then need to weigh that because he could then determine anywhere within that range as to what might be appropriate, correct? No. I do not think, again, absent safety valve, that he could go below the mandatory minimum sentence. Correct. Correct. With that caveat. With that caveat, he would have a delta in order to do the sentencing. Right. But in this case, the government's position is there was no sentencing entrapment. The defendants on this record just haven't shown it. And again, they didn't produce any evidence of sentencing on this. I don't – there is – they had the opportunity. They didn't. So I – the government's position is they shouldn't be given a second bite at the apple. The evidence in this case showed that the defendants very willingly were interested in doing a 100-kilogram deal. They were ecstatic that they could make money from Agent Morinelli in one of the conversations with Andrade. We can make a lot of money, or something to that effect, was what they told Andrade. The idea that they were just playing a game with Agent Morinelli really doesn't make a whole lot of sense when they were convinced, based on – again, based on the and that his bodyguard was a stone-cold killer, I believe was the term they used. That's not somebody you go rip off. So I think you consider all the evidence. I heard all that, right? Didn't believe it. Right. Correct. So you consider all the evidence. There just isn't any sentencing entrapment. The defendants were very eager to participate in the 100-kilogram deal. They just didn't expect their roots would get discovered when it did. As far as a couple of the other issues that were addressed, on the disclosure of the A file that Defendant Bermudez raises, that has to be evaluated in the context of what the defendant actually asked for. Prior to trial, the defendant asked basically to get access to the entire A file. The court – the government said, I'll look through – the prosecutor said, I'll look through the A file for any exculpatory evidence, and the court indicated that that be done by a date certain. After that, I don't recall any – I didn't see any indication in the record that that was ever raised again. So what we're evaluating is was the court – how the court handled that correct. And the government's position is it was. So the government says that they're not even the first step of Brady that's satisfied here because what they asked for, they got. Well, did they get it from the government? Well, they didn't get the whole A file. Yeah, but they got the supposedly any exculpatory. Or is there no record of that? There's no record, actually. And it was never raised again. Right. So what did you give them? There's nothing in the record that discloses what was disclosed, Your Honor. And what I'm saying is what you need to evaluate is was the court's decision not to disclose the entire A file to the defendant correct. And that clearly was correct because simply making a Brady claim doesn't entitle the defendant to rummage through all government files. Did the – does the record indicate whether the court actually examined the A files? There is no indication that the court did. And the way it was ordered, it would be unlikely that the court did, quite frankly. I mean, it would be the normal government obligation, take a look at the documents. Right. Evaluate and turn them over. Right. So and let's see. What else we got? Oh, the translator issue. Well, I just want to finish up. They said that you did tell them you paid $19,000 in this case. I'm sorry, Judge, I didn't catch that. In the argument here, they said the government told them that you paid $19,000 to the confidential informant. Okay. Is that right? That's my understanding. But that wouldn't have been in the A file in any event. That would have been in the DEA's confidential informant file. But you didn't tell them anything about his criminal record. I believe what was – I believe it was disclosed, his criminal record, to the extent he had one. Again, I'm not recalling all of it correctly, but it was – again, what the government had it disclosed is the government's position. Well, as I understood the argument by one of the counsel there, I guess it was Ms. Matheson, I think she was suggesting that they did cross-examine him on the criminal record aspect. Maybe I misunderstood. Is that a recollection? That definitely was done. So to some degree, it's kind of redundant. Right. But my belief is it was disclosed, to the extent there was one. And then – What was disclosed? His criminal record. His whole criminal record. What? His whole criminal record. That's my understanding. On the translation issue, again, under this Court's cases, you use a four-factor test to determine whether the interpreter is – basically qualifies as a conduit. The first one is which party supplied the interpreter. Obviously, in this case, the government did supply the interpreter, but there is case law that says that fact in and of itself is not determinative. The second factor is a motive to mislead or distort on behalf of the interpreter. Again, this interpreter had every incentive to make the deal, the transaction, succeed. And more importantly, the record showed that Agent Morinelli understood some Spanish and the defendants understood some English. So with that scenario going on, there is quite a likelihood that any intentional mistranslation might have been caught. For example, during the trial, Agent Morinelli was asked, who came up with the $23,000 a kilo figure? And he said the defendants did because I can understand 23 in Spanish. He knew it was the defendant that had mentioned 23,000 and not Andrade because he spoke enough Spanish to recognize the 23,000. Well, that's an argument that his interpretation could be checked, but why should we have an agent in the very case he's interpreting him? Well, you would have that in almost any situation. That's why you have that four-factor test to determine whether it's acceptable or not. Because what if Agent Morinelli spoke perfect Spanish and did the interpreting himself? He's a government agent. He's on the government payroll. I mean, it's not, it's not determinative of which party supplies the interpreter. The third factor of the court considers. Well, they say they objected to this interpreter. Excuse me, Judge? The defendants say they objected to the bias of this interpreter. They objected to using the interpreter as for Agent Morinelli to use the interpreter's translation. That's correct. The third factor is the qualifications of the interpreter. No one really is even challenging that. The interpreter was bilingual. And finally, the fourth factor is whether actions taken subsequent to a conversation were consistent with the translated statements. These negotiations extended over many different meetings. And in each time, they kind of picked up where they left off. It clearly is. For example, the first meeting with Agent Morinelli, he asked the price of the cocaine. The next meeting, he gets the price. That's consistent with what happened. They talk about the purchase of a, the one kilogram sample. That happens in the next transaction. Again, that's consistent. In other words, if there was misinterpretation, this wouldn't have, it would have broken down basically. So the Court did not err in relying, in letting the, the informant act as the conduit under the, this Court's case law. Unless the Court has any other questions. It appears not. Thank you. Thank you. I'd like to thank all counsel for your argument this morning. The case of United States v. Bermudez is submitted. Thank you.
judges: Noonan, McKeown, Smith